| | | |
|---|---|---|
| GREGORY MARTHALER, | ) | Case No. 06 cv 3332 |
| | ) | |
| Plaintiff, | ) | Judge Kennelly |
| | ) | |
| GLENBARD SCHOOL DISTRICT | ) | Magistrate Judge Nolan |
| DISTRICT #87, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURUSANT TO 50 (a)(1)

NOW COMES the Defendant, BOARD OF EDUCATION OF GLENBARD TOWNSHIP HIGH SCHOOL DISTRICT 87 ("Glenbard"), improperly plead as GLENBARD SCHOOL DISTRICT #87, by its attorneys Stephen Miller and Sheryl Allenson, and requests this Court grant it Motion for Judgment as a Matter of Law pursuant to Fed. R. Civ. Pro. 50 (a):

## INTRODUCTION

Plaintiff has brought suit under the Age Discrimination in Employment Act ("ADEA"), alleging that he was terminated by Glenbard as a result of his age. Plaintiff was a tenured English teacher at Glenbard.

Plaintiff has failed to present any evidence, either directly or indirectly, from which a reasonable jury could conclude that Glenbard intentionally discriminated against

1

Plaintiff based upon his age. As a result, as a matter of law, this Court should grant

Defendant's motion for judgment as a matter of law.

## Legal Standard

Rule 50(a) motions are evaluated using like standards as motions for summary

judgment. See *Reeves v. Sanderson Plumbing Prods. Inc.* 530 U.S. 133, 150, 120 S. Ct.

2097, 2110 (2000) A trial judge must direct a verdict if under governing law, there can be

only one reasonable conclusion to the verdict. *Anderson v. Liberty Lobby, Inc.* 477 U.S.

242, 106 S. Ct. 2505, 2511 (1986). The trial judge must construe the evidentiary record

in favor of the non-moving party, draw all inferences in its favor, and must not make

credibility determinations or weigh the evidence. See *Reeves,* 530 U.S. at 50-51, 120

S.Ct. at 2110.

## ARGUMENT

Plaintiff brings his claims under the Age Discrimination in Employment Act

(ADEA). As stated in *Chiaramonte v. Fashion Bed Group*, 129 F.3d 391 (7th Cir. 1997)

"To succeed in an ADEA claim, a plaintiff must establish that he would not have been

terminated "but for" his employer's intentional age-based discrimination." *Chiaramonte,*

129 F.3d at 395. In order to prevail, Plaintiff can rely on one of two methods, the second

of which is typically utilized. See *Chiaramonte, 129 F.3d at 396.* "He may try to meet his

burden head on by presenting direct or circumstantial evidence that age was the

determining factor in her discharge. Or, as is more common, she may utilize the indirect,

burden-shifting method of proof for Title VII cases originally set forth in *McDonnell Douglas Corp v. Green,* 411 U.S. 792 (1973)." *See Chiaramonte, 129 F.3d at 396.*

**A.**   **There is no Direct or Circumstantial Evidence of Age Discrimination**

1.   **Marthaler has offered no direct evidence of age discrimination**

The first method of proof, the "direct" method, itself contains two subtypes of evidence upon which a Plaintiff can rely in order to ultimately prove his case by a preponderance of the evidence. One is "direct evidence," the second, "circumstantial" evidence." Plaintiff has presented neither here.

Direct evidence is typically considered "a virtual admission of discrimination" by a decision maker, such that the trier of fact need make no inference or presumption about the alleged discrimination. See *Rogers v.City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003) (citing *Radue v. Kimberly Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). Instead, the "direct evidence" "speaks for itself" *Rogers,* 320 F.3d at 748 (citing *Walker v. Glickman,* 241 F.3d 884, 888 (7th Cir. 2001). In this case, the Plaintiff has offered no direct evidence that would allow a reasonable trier of fact to determine that, but for Plaintiff's age, he would not have been terminated.

**2.**   **There is no circumstantial evidence from which a reasonable trier of fact could infer that Glenbard intentionally terminated Plaintiff as a result of his age.**

Circumstantial evidence must have a real causal link to a termination. Under this method of proof, a "reasonable trier of fact" must be able to infer that a decision maker

intentionally terminated Plaintiff as a result of his age. See *Silverman v. Johnson*, 2004 U.S. Dist. LEXIS 19767 (N.D. Ill. 2004). *Chiaramonte*, 129 F.3d at 395.

During the course of this trial, the Plaintiff has claimed repeatedly that as he neared 50, he was near the top of the salary scale, would stay there, that the district was in a budget crunch, and that all of these factors resulted in his termination.

Circumstantial evidence must have a real casual link to the termination. *See Adams v. Wal-Mart Stores, Inc.* 324 F.3d 935 (7th Cir 2003). The evidence does not have a real causal link to Plaintiff's termination, as demonstrated in during the week of trial testimony. Here, Plaintiff provides no such evidence, whereby a reasonable juror could infer there was intentional termination.

In fact, the evidence demonstrates that Marthaler's theory of his age/salary/budget triumvirate must fail. Although there was testimony regarding budget issues, the evidence shows reductions in tenured teachers were **not** discussed, (Trial Tr. Hyland Cross 446:21-25). Hyland also testified that the district **did not lay** off any tenured teachers due to budget cuts. (Trial Tr. Hyland Cross 448:2-4.) The district did not tell principals or department chairs to look for head count reductions by terminating highly paid tenured teachers. (Trial Tr. Hyland Cross 448: 5-8)

Despite Dr. Hyland's specific testimony, Marthaler still testified that he relies on Hyland as "evidence" that the Glenbard planned to terminate him due to his age, because he was a highly paid employee. See testimony, November 1, 2007. Both Maria Ward and Pat Meyer testified that they received no pressure or mandate from administration to address the district's budget issues, by cutting tenured positions. (Trial Tr. Ward Cross

302:14-20; 303:3-5; 303:13-14.) Plaintiff did not introduce any evidence drawing any nexus between the budget constraints in the district, and his termination.

Additionally, comments such as "veteran teacher" "20 year teacher" or young teacher" do not rise to the level of circumstantial evidence," Defendant's descriptive comments within evaluations do not rise to the level of "circumstantial evidence" Plaintiff relies on descriptive comments in evaluations as evidence of age discrimination. See *Rogers*, 320 F.3d at 749. Words that are descriptive, but not evaluative, are not sufficient as direct or circumstantial evidence of age discrimination. Simply, there a dearth of circumstantial evidence to support Plaintiff's case.

B.    **Plaintif Cannot Prove his Case Indirectly**

In order to prove his case in the absence of direct or circumstantial evidence, Plaintiff must apply the more commonly used indirect approach of proof—the "burden shifting" paradigm. Initially set forth in *McDonnell Douglas Corp. v. Green* , this approach has long since been adopted by courts in age discrimination matters. See, *Hemsworth v. Quotesmith.com, Inc.,* 476 F.3d 487 (7th Cir. 2007). (*Adams,* 324 F.3d at 939 See also, *Tye v. Chertoff*, 2006 U.S. Dist. LEXIS 71082 (N.D. Ill. 2006). As with the direct method, Plaintiff maintains the ultimate burden of persuasion. He must ultimately persuade the jury that the defendant intentionally discriminated against him." See *Chiaramonte*, 129 F.3d at 399.

Under this approach, Marthaler must initially establish his *prima facie* case. If, and only if he is able to do so, the burden of production shifts to Glenbard, to articulate legitimate, non-discriminatory reasons for its action to terminate Plaintiff. Then, the

burden shifts again to the Plaintiff to show that the stated reasons were pretext. See, *Denisi*, 99 F.3d at 865.

To meet his initial burden, he must show:

- That he was a member of the protected class (40 or over);

- That he was performing his job satisfactorily

- That he was discharged;

- That substantially younger, similarly situated employees were treated more favorably.

In a case with similar facts, the Seventh Circuit affirmed the District Court's entry of summary judgment in favor of the employer. See, *Denisi v. Dominick's Finer Foods*, 99 F.3d 860, 865 (7th Cir. 2007) In that case, the employee had received supervisor counseling regarding the need for improvement on performance, direction to construct an action plan, and history of evaluations from "mediocre to poor" performance. Denisi was terminated, and despite the history of performance issues, he argued that he was terminated due to his age, and that his performance had in fact been satisfactory (he did admit, however, that he had received the actual evaluations that stated otherwise, to certain events, which Dominick's claims were unsatisfactory. *Denisi*, 99 F.3d at 865

The *Denisi* Court stated that it is the **employer's** perceptions—not the **employee's**—that are relevant. See, *Denisi,* 99 F.3d at 865 (citations omitted). Like Denisi's efforts, Marthaler's own self-serving statements regarding his job performance are not sufficient to satisfy his burden to produce evidence "[Employee] needs to offer more than his own perception of his performance." See, *Denisi,* 99 F.3d at 865.

The *Denisi* Court affirmed the District Court's entry of summary judgment in favor of the employer, stating the Plaintiff had failed to make set forth its *prima facie* case.

1. **Marthaler has offered no evidence that he was performing satisfactorily**

Like *Denisi*, Greg Marthaler offered no evidence, other than his perceptions, that he was performing his work satisfactorily.

Plaintiff's own evidence indicates that Glenbard was confined to three ratings: 'Excellent,' "Satisfactory, and "Unsatisfactory." "Unsatisfactory" automatically triggered the remediation process. As a "term of art" "satisfactory" did not translate to "performing satisfactorily" Pat Meyer testified on November 1, 2007 that, other than Plaintiff, no one received a "Satisfactory" rating. The **content** of Marthaler's evaluations and observations, all of which are in evidence, establish that in fact his performance was not satisfactory, as deemed by his evaluators.

Marthaler offers no evidence, other than his own opinion, that his performance was satisfactory. The record is devoid of testimony supporting his thoughts and opinions that he was a "good teacher" He offers no evidence that he assessed his students to determine if they actually learned; he offers no evidence to objectively support his statement that his lessons were good." He offers no evidence that his teaching methods were sound. Instead, he simply makes bald assertions about his teaching proficiencies as it relates to Glenbard's standards. This is not sufficient to withstand to motion for directed verdict.

2. **Marthaler has failed to offer evidence to establish that substantially younger, similarly situated employees were treated more favorably**

Similarly, Marthaler has failed to offer evidence to establish that substantially younger, similarly situated employees were treated more favorably. In order to define "similarly situated" Plaintiff must be guided by case law, not by his generalization that the universe of all teachers creates the "comparable" pool. Plaintiff must provide evidence that "compares an apple with an apple," therefore, comparisons must include only other persons *"who were similarly situated with respect to performance, qualifications, and conduct; the plaintiff and he other similarly situated employees must have shared a common supervisor..."* See *Hemsworth,* 476 F.3d at 492. See also, *Balderstone,* 328 F.3d at 320. Under Plaintiff's theory, all teachers would by deemed "similarly situated," because all receive evaluations, and all evaluations contain recommendations and constructive criticisms. Obviously, these are not the "apples" the law intends as comparables. "Statistical evidence is only helpful when the plaintiff faithfully compares one apple to another without being clouded by thoughts of Apple Pie ala Mode or Apple iPods. Hemsworth's proposed statistical evidence lacks the necessary context needed for a meaningful comparison and therefore must be rejected." See, *Hemsworth,* 476 F.3d at 492. Marthaler has not presented any evidence that he was treated less favorably than other apples. See also, *Balderstone,* 328 F.3d at 320; *Radue,* 219 F.3d at 616.

Plaintiff seeks to provide that he was discriminated against by offering evidence that younger students were not terminated as a result of similar "criticisms." This argument falls on numerous fronts, and must fail.

In an effort to draw a nexus between age and his dismissal, Plaintiff goes to great lengths to offer snippets of numerous "younger" teachers' evaluations, where he has

isolated similar recommendations or critisms. (Trial Tr. 241:16-22; 244:14-15: 245:15-25: 246:1-6: 252:9-10; 252:16-17: 253:125: 254: 1-22: 255:3-4: 255:8-10.  For numerous reasons, this falls short of establishing any basis of support for age discrimination.

First, Maria Ward testified, these teachers were not similarly situated. Unlike Plaintiff, while each individual teacher may have had a similar isolated comment or criticism, these teachers showed observable improvement over time in more situations. (Trial Tr. 276: 12-20.) (Ward Cross 311:5-9) Marthaler failed to offer evidence to demonstrate that he was similarly situated, and that he, too, took the suggestions made too him. (Trial Tr. Ward Cross 276:21-25, 277:1-5)

Second, even if Plaintiff was similarly situated based on the isolated comments, which he is not, Plaintiff has demonstrated **by his own evidence** , several of the teachers Plaintiff states were treated ***more favorably*** are not only within the protected class, but are substantially the same age. (Trial Tr., 257-274.) Debra Bobinsky, one of the teachers Plaintiff introduces as having similar comments, but having been treated more favorably, was ***48 years old***; Bill Litell, another of those teachers, **was 45 years old**. If several of the teachers whom Plaintiff states were so unfairly favored were not comparables himself are not only within the protected class, but substantially similar in age. In fact, Plaintiff's evidence is contrary to his *prima facie* case. By introducing Bobinsky and Litell as comparables, he cannot demonstrate that but for his age, he would not have been terminated. His *prima facie* case must fail.

Plaintiff has failed to satisfy his burden to produce evidence to initially establish his ***prima facie*** case. He has neither presented evidence adequate to show he was performing his job satisfactorily, nor that other, similarly situated teachers outside the

protected class (or substantially younger) were treated more favorably. See, *Chiaramonte*, 129 F. 3d 391, 398. Judgment as a matter of law is proper in this case, as there is no other reasonable outcome based upon Plaintiff's failure to establish his *prima facia* case. Plaintiff's claim fails, and Defendant need not produce evidence of non-discriminatory reason; instead, a verdict should be directed in its favor and against Plaintiff.

Even if, *arguendo*, Marthaler had been able to establish his *prima facie* case, shifting the burden to defendant, Glenbard has articulated a legitimate, non-discriminatory reason for terminating Plaintiff. It seeks to remove an unsatisfactory, ineffective teacher from the classroom to ensure that students have the opportunity for effective teaching. Throughout the course of this trial, Glenbard has proffered evidence about its classroom observations, examples of ineffective teaching, and lost opportunity for student learning. Consistently, Defendant has articulated dire concern over Plaintiff's ability to teach students. See Ward, Meyer and McBride testimony. Defendant met its burden of production, such that the burden again shifts back to Plaintiff.

Simply, Plaintiff has proffered no other evidence demonstrating that Defendant's articulated reasons for termination are pretexual, and therefore, cannot as a matter of law prove that but for age, he would not have been terminated.

Although he offers theories, ideas and concepts, Plaintiff's case is devoid of actual evidence upon which a reasonable jury could find that Glenbard intentionally discriminated against Plaintiff on the basis of age. As a result, judgment is proper as matter of law, and the verdict should be directed against Plaintiff and in favor of defendant.

WHEREFORE, the Defendant, BOARD OF EDUCATION OF GLENBARD TOWNSHIP HIGH SCHOOL DISTRICT 87 ("Glenbard"), improperly plead as GLENBARD SCHOOL DISTRICT #87, respectfully requests its Motion for Judgment as a Matter of Law be granted; that a Verdict be Directed in Favor of Defendant and against Plaintiff; and , for all other and further relief this Court deems appropriate under the circumstances.

Respectfully submitted,

**MYERS MILLER & KRAUSKOPF, LLC**

By: _____
Stephen R. Miller

Stephen R. Miller ARDC #6182908
Sheryl Allenson ARDC #6210165
MYERS MILLER & KRAUSKOPF, LLC
30 North LaSalle Street, Suite 2200
Chicago, IL 60602
(312) 345-7250

## CERTIFICATE OF SERVICE

To:     Attorneys of Record
        *(See Attached Service List)*

I, Stephen R. Miller, an attorney, certify under penalties as provided by law that copies of the following were directed to counsel of record via electronic mail on October 4, 2007

_____/s_____Stephen_____R.
Miller_____

Stephen R. Miller

MYERS MILLER & KRAUSKOPF, LLC
30 North LaSalle Street, Suite 2200
Chicago, Illinois 60602
(312) 345-7250

1  about my on-time performance.  On the other hand, I probably

2  wouldn't be that much worse than the actual airlines in that

3  regard because nothing is ever on time anymore.

4        But I just -- you know, to use a word that got used

5  on the daily show at some point, I misunderestimated.  I

6  apologize for that.  I am going to do better tomorrow.

7        We are ready to resume with the witness' testimony.

8  Do you understand you are still under oath?

9        THE WITNESS:  Yes.

10       THE COURT:  Mr. Gonzalez, you can proceed.

11       MARIA WARD, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

12              CONTINUED DIRECT EXAMINATION

13 BY MR. GONZALEZ:

14 Q  Good morning, Ms. Ward.

15 A  Good morning.

16 Q  Ms. Ward, this morning I am going to ask you some

17 questions about things that you considered in evaluating

18 younger teachers, and I would like to refer you to Exhibit

19 Number 59 in the plaintiff's book.  This is a performance

20 evaluation of a Jake Novak, and you are familiar with Mr.

21 Novak?

22 A  Yes.

23       THE COURT:  The number again is 59 or 69?

24       MR. GONZALEZ:  Exhibit 59.

25       THE COURT:  Thank you very much.  Sorry.

1    A    No.

2    Q    Do you believe that --

3       And you assigned a rating of excellent nonetheless,

4   correct?

5    A    I assigned a rating based on the overall recommendation,

6   yes.

7    Q    Now, do you believe that Greg had any of these students in

8   his classes who were difficult to motivate?

9    A    Did Greg have some students in his class that were

10   difficult to motivate?

11    Q    Right.  Did he ever teach students like that?

12    A    I suspect like most teachers, he probably had some kids

13   that were difficult to motivate, yes.

14    Q    Do you know a Jennifer Ennis?

15    A    Jennifer Ennis, yes.

16    Q    Hopefully there is a Plaintiff's Exhibit 53 in your book.

17    A    Yes.

18    Q    There is?

19    A    Yes.

20    Q    If you look at the page that has --

21       Do you recognize this, first of all, as an evaluation

22   that you did of her in October of 2003?

23    A    It says she was observed on the 9th, yes, October 9th,

24   2003.

25    Q    Referring you to the page in the lower right-hand corner

1  where it has the numbers 2464?

2  A    Yes.

3  Q    Looking at the first full paragraph and the second full

4  paragraph on that page, I would like you to just read those to

5  yourself for a moment where she is talking about what happened

6  when Ms. Ennis asked the students to move into small groups

7  and then that next paragraph, and just take a moment and read

8  that to yourself.

9  A    The first two full paragraphs; is that what you said?

10  Q    Right.

11     (Brief interruption.)

12  BY THE WITNESS:

13  A    Yes.

14  BY MR. GONZALEZ:

15  Q    Would you agree with me, Ms. Ward, that those are similar

16  to criticisms that you had of Greg when you observed his

17  classes?

18  A    Not exactly.

19  Q    So you never criticized Greg for students having a lack of

20  direction, sitting silently, not participating?  You never

21  criticized Greg for things like that?

22  A    I am not saying that there weren't some things like that

23  that I pointed out, but I think, in fairness, if you are going

24  to pull something here and here is the one context, then you

25  have other documents, and you could pull those from Greg's and

1  compare them exactly.  That would probably be the best way to

2  go.

3  Q   I understand your argment, Ms. Ward.  I am just asking you

4  if these are similar to things you have criticized Greg for in

5  the past?

6  A   There are some similarities.

7  Q   There are some.

8         Referring you to the last -- the page marked 2469 a

9  little farther into the exhibit, 2469, this is a later

10 evaluation that Ms. Meyer performed of Ms. Ennis?

11 A   Yes.

12 Q   You initialed the page in the lower right-hand corner,

13 correct?

14 A   Initialling the page at the lower right hand corner means

15 that I read it, yes.

16 Q   Is it true, as it states in the last paragraph, that Ms.

17 Ennis does not have a master's degree?

18 A   If at that time that is what Mrs. Meyer wrote, I would say

19 it's probably accurate.

20 Q   You have no reason to doubt it.

21 A   Where is that located?

22 Q   It's in the very last sentence.

23        "Ms. Ennis must continue to work on her master's

24 degree and complete it as soon as possible."

25 A   "Complete your master's degree in a timely fashion", it

1   A   I don't think one statement is focused, but it's probably

2   unnecessary.

3   Q   How do you know Ms. Meyer wasn't focusing on that by

4   making that remark?  You don't know, do you?

5   A   I don't know any more than you do, I guess.

6   Q   In fact, you have testified that you had no idea what Ms.

7   Meyer was thinking when she wrote that letter?

8   A   That is correct.

9   Q   Do you know a Debra Bobinsky?

10  A   Yes.

11  Q   If I can refer you, hopefully you have an Exhibit 52 in

12  your plaintiff's book?

13  A   Yes.

14  Q   Page 2207.  Will you look at the second full paragraph and

15  there is a sentence that starts out:

16          "I would suggest, however, that Ms. Bobinsky consider

17  ways she might engage the students more actively."

18          Do you see where that is written?

19  A   In the second paragraph?

20  Q   Right, second full paragraph, in about the middle.

21  A   Yes.

22  Q   In fact, you wrote this one, didn't you?

23  A   Yes, I did --

24  Q   Would I be accurate then that you are criticizing her

25  for --

1    Well, let's take your words. What do you mean by a

2    broadcast question? You said when she tended to ask

3    questions, she would do it by way of a broadcast model.

4    What do you mean by that?

5    A    Broadcast question model, and it's the term that some of

6    us use as evaluators, is when a teacher -- and I think this is

7    pretty commonly practiced unless people retrain themselves

8    actually, it is very -- you just ask an open-ended question,

9    you don't call on a specific student, and you tend to rely

10    then on volunteers, kids who raise their hand.

11    If that is a pattern that persists, what can happen

12    is that only certain kids get air time, always the same kids

13    getting called on.

14    Q    Isn't that what you are saying here, that she needs to

15    consider ways to engage the students more in discussions?

16    A    Absolutely.

17    Q    Would you agree with me that is a criticism you have made

18    of Greg Marthaler?

19    A    Again, I wouldn't use the word "criticism". I will tell

20    you that I have offered that suggestion to pretty much

21    everyone I have every evaluated regardless of how many years

22    they have taught because it is just a really hard habit to

23    break.

24    Q    We won't call it a criticism.

25    Have you ever observed Greg Marthaler's classes and

1   expressed the opinion that the way he was questioning students

2   wasn't engaging them enough?  Have you ever done that?

3   A   I have given this suggestion to Greg Marthaler, yes.

4   Q   Do you know a William Littel?

5   A   Yes.

6   Q   If I could refer you to number 58 in the plaintiff's book?

7   A   Oops, don't have that one either.

8   Q   Let me hand you Exhibit 58.

9   A   Thank you.

10  Q   If I could refer you to the next to the last page?

11  A   Okay.

12  Q   In that first full paragraph, do you see where you wrote

13  in about the middle -- Ms. Meyer wrote the view; you merely

14  gave the evaluation rating?

15  A   That is correct.

16  Q   Do you see where Ms. Meyer writes:

17          "A pattern emerged that I noted during the

18  observation.  Mr. Littel usually answers his own questions.

19  Students did not raise their hands to answer during these

20  thought-probing questions, and when no one responded,

21  Mr. Littel spoke."

22          Do you see where she writes that?

23  A   Yes, I do.

24  Q   Would you agree with me that that is very similar --

25          Would you agree with me that is identical to a

1    criticism you have made when you have observed Greg Marthaler

2    in the classroom?

3    A    I remember pointing this out to Mr. Marthaler in an

4    observation, yes.

5    Q    It's one of the reasons you thought Greg wasn't a very

6    good teacher, right?  This very thing is one of the things,

7    right?

8    A    This is one of the things we pointed out to him that we

9    wanted him to improve on.  Unfortunately, we kept seeing the

10   same thing occur.

11   Q    Well, how important was it, this particular one?

12   A    It was important along with all the other reasons.

13   Q    It's also indicated in this evaluation that Mr. Littel

14   has -- she makes the comment at one point that he teaches

15   at-risk students, students who were identified as disliking

16   school and that that is a challenge for any teacher.

17            Do you know what she is talking about there?

18   A    What page are you on?

19   Q    I would have to refer you for that to Page 3.  It says

20   2925 in the lower right-hand corner under Classroom

21   Environment?

22   A    Where it says "his assignment"?

23   Q    Right.

24   A    Yes.

25   Q    Do you know what she is talking about there, that he has

1 Q    And tell us -- can you give us a little bit of history as

2 to when budget issues began in our district and how they

3 changed over time?

4 A    I would say budget issues probably a few years prior to

5 the 04-05 school year, like many districts, but in District 87

6 we had to make some budget cuts I think as early as maybe

7 01-02, somewhere in there, and then made some budget cuts over

8 the years, but it was usually things that -- they tried to

9 keep it as far away from the students as possible.

10 Q    And that's what I want to ask you.  What types of things,

11 to your knowledge as a hiring person, did the district do to

12 trim staff?  Staff is a big part of your expense, right?

13 A    Correct.

14 Q    All right.  So how did you deal with budget pressures in

15 terms of certified tenured teachers versus nontenured support

16 and all the rest?

17 A    All right.  The staffing issue, we were told in those last

18 couple of years before 04-05 to kind of look at an average, an

19 average salary that we were shooting for, so they never said,

20 you know, you couldn't hire anybody --

21        MR. GONZALEZ:  Objection.  Lack of foundation.

22        THE COURT:  In other words, you want more specifics

23 about where this came from.

24        MR. GONZALEZ:  Yes.

25        THE COURT:  I think that's appropriate.

1   BY MR. MILLER:

2   Q   Who would you have those discussions with and when?

3   A   Okay.  The discussions about hiring average was with the

4   assistant superintendent for personnel.

5   Q   Mr. Pagels?

6   A   Yes.

7   Q   And when did those start to be an issue?

8   A   Probably 02-03, 03-04, somewhere in there, and we would

9   meet weekly with the principals, the district office personnel

10  and the principals, and so we'd have those discussions

11  probably a little bit before February because we would begin

12  the hiring process right around that time.

13  Q   All right.  And were there cuts made in terms of teaching

14  staff through some methods, tenured or not tenured?

15  A   The only cuts that were made that I recall while I was

16  there was in the 04-05 school year when two referenda were run

17  and both failed, and then for the 05-06 school year students

18  would only have the opportunity to take six classes instead of

19  seven.

20  Q   Okay.  Were there some layoffs or cuts of non-teacher

21  personnel at the district?

22  A   In '04 -- yes.  Going into the 04-05 school year, District

23  87 outsourced its custodial and maintenance staffs.  That was

24  a rather significant cut, yes.

25  Q   Okay.  And in terms of -- did they have an approach to

1  A   Yes, sir.

2  Q   Isn't that true?

3        And isn't it true, sir, that the board ultimately

4  terminated your own employment the day after a referendum to

5  increase taxes had failed?

6  A   That is accurate.

7  Q   The very next day?

8  A   Yes, sir, that morning.

9  Q   Who made that announcement to you?

10 A   Board president, Mr. Brown.

11       MR. GONZALEZ:  No further questions.

12       THE COURT:  Mr. Miller.

13                   CROSS EXAMINATION

14 BY MR. MILLER:

15 Q   Good afternoon, Dr. Hyland.

16 A   Good afternoon.

17       THE COURT:  It's still morning.  I didn't start that

18 late.

19       MR. MILLER:  Right.

20 BY MR. MILLER:

21 Q   I heard you talk about a lot of reductions, but I didn't

22 hear you talk about cutting tenured teachers.  Were any of the

23 ideas that were discussed involving the cutting of tenured

24 teachers?

25 A   No, sir.

1  of them.

2          While you were at the district, did the district lay

3  off any tenured teachers due to budget cuts?

4  A   No.

5  Q   While you were at the district, did the district ever tell

6  any principals or department chairs to look for head count

7  reductions by terminating highly paid tenured teachers?

8  A   No.

9          MR. MILLER:  No more questions.  Thank you very much,

10  Dr. Hyland.

11          THE COURT:  Mr. Gonzalez.

12                  REDIRECT EXAMINATION

13  BY MR. GONZALEZ:

14  Q   Isn't it true, Doctor, as you just explained, a school

15  district can't just terminate a tenured teacher with no

16  process?

17  A   That is true.

18  Q   So wasn't that one of the main reasons for making the

19  early retirement option more attractive to these older tenured

20  teachers?

21  A   I think that is safely put.

22          MR. GONZALEZ:  No further questions.

23          THE COURT:  Mr. Miller, anything else?

24          MR. MILLER:  Mr. Miller has one more question.

25          THE COURT:  Is it a real one or a lawyer's one?

1     MR. MILLER:  It is a real question, but you know
2  lawyers; they always ask one too many.
3          THE COURT:  That is why I asked.
4                  RECROSS EXAMINATION
5  BY MR. MILLER:
6  Q   Were there any head count reductions of tenured teachers?
7  A   No.
8          MR. MILLER:  Thank you.
9          THE COURT:  Anything else, Mr. Gonzalez?
10         Do any of the jurors have any questions for Dr.
11 Hyland?
12         (No response).
13         THE COURT:  I don't see anybody writing.  Thank you,
14 Dr. Hyland.  You are excused.
15         THE WITNESS:  Thank you.
16    (Witness excused.)
17
18         THE COURT:  Please call the next witness.
19         MR. MASSATT:  The plaintiff would like to call Dr.
20 Molek.
21    (Brief interruption.)
22         THE COURT:  Come right up here.  Just come right on
23 around.  Please raise your right hand.
24    (Witness sworn.)
25         MR. MASSATT:  Your Honor, permission to examine Mr.